IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JULIE A. SU, | ) | |
| Acting Secretary of Labor, | ) | |
| United States Department of Labor | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No.: 8:24-cv-00483-PJM |
| | ) | |
| AXIM FRINGE SOLUTIONS GROUP, LLC, | ) | |
| AXIM MANAGED RETIREMENT SOLUTIONS, | ) | |
| LLC, AXIM GLOBAL STRATEGIES GROUP, | ) | |
| LLC, JAMES CAMPBELL, MELISSA | ) | |
| MCMANES, FUTURE MIND CONSULTING, | ) | |
| LLC, AND BWELL, INC., | ) | |
| | ) | |
| Defendants. | | |

## <u>AMENDED COMPLAINT</u>

Plaintiff Julie A. Su, Acting Secretary of Labor, United States Department of Labor ("the Acting Secretary") hereby alleges:

1.      This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, et seq., and is brought to obtain relief under Sections 409 and 502 of ERISA, 29 U.S.C. §§ 1109 and 1132, in the form of equitable remedies that will redress violations, obtain appropriate equitable relief for breaches of fiduciary duties under ERISA Section 409, 29 U.S.C. § 1109, and obtain such further equitable relief as may be appropriate to enforce the provisions of Title I of ERISA.

2.      Defendant Axim Fringe Solutions Group, LLC ("FSG") markets itself as a no-cost administrative service provider to government contractor employers who are required to provide fringe benefits to employees under the McNamara O'Hara Service Contract Act, 41 U.S.C. § 6701, et seq. ("SCA"). Under the SCA, government service contractors are required to

provide service employees working on federal service contracts with fringe benefits, as specified by the U.S. Department of Labor and prescribed in the applicable wage determination. 41 U.S.C. § 6703(2); 29 C.F.R. §§ 4.6, 4.170(a).

3.      FSG's clients are employers performing on contracts with the federal government for the principal purpose of providing services, and thus are subject to the SCA's fringe benefit requirements. These employers decided to satisfy part of their SCA fringe benefit obligations by providing health insurance or other welfare benefits to their service employees. To do this, the clients established health and welfare benefits plans governed by Section 3(21) of ERISA, 29 U.S.C. § 1002(21).

4.      FSG helped its service contractor clients administer these ERISA health and welfare plans, paying its own fees from the health and welfare contributions which its clients were required to make on behalf of their employees under the SCA. For each client, Defendant FSG and its 98% owner, Defendant James Campbell, established a trust account ("Sub-Trust") to hold the client's contributions to these ERISA plans. FSG and Campbell named themselves as trustees of the Sub-Trusts. FSG and Campbell agreed to use the funds in the Sub-Trusts to purchase health and welfare fringe benefits, such as health insurance, for the client's employees. FSG and Campbell also agreed to use the funds in the Sub-Trusts to pay fees to FSG.

5.      Campbell and FSG commingled the employers' contributions in a single account, the Axim Fringe Solutions Group Master Trust ("FSG MT"). The funds in the FSG MT and the Sub-Trusts are plan assets (hereinafter "Health and Welfare Plan Assets").

6.      From December 2015 to present, FSG, Campbell, and Defendant Melissa McManes transferred Health and Welfare Plan Assets to the FSG Operating Account ("FSG OA") in amounts greater than the fees that FSG's clients had agreed to pay. These transfers

exceeded $5 million and were made to enrich FSG and Campbell. Defendants FSG, Campbell, and McManes intermittently moved Health and Welfare Plan Assets among various accounts, including the FSG MT, the FSG OA, and various Sub-Trusts, to meet FSG's operating expenses.

7.    Campbell also wholly owns Defendant Axim Managed Retirement Solutions ("AMRS"), which collects employer 401(k) contributions and agrees to forward them to various retirement plans governed by Section 3(2)(A) or ERISA, 29 U.S.C. § 1002(2)(A). The employers' contributions to AMRS are plan assets (hereinafter "Retirement Plan Assets").

8.    Campbell, McManes, FSG, and AMRS, in violation of their fiduciary obligations, routinely transferred Retirement Plan Assets to and from the AMRS Master Trust ("AMRS MT") to and from the FSG MT.

9.    Campbell owns at least 97% of, and wholly operates, a third company, Defendant Global Strategies Group ("GSG"), that acted as an insurance broker, for a fee, to some of FSG's clients. In this way, Campbell, exercising discretionary authority and control over the Health Plan Assets, used those assets to pay commissions to a company that he owned, in violation of ERISA.

10.    Campbell also owns and operates Future Mind Consulting, LLC and BWell, Inc. Campbell and McManes transferred Health and Welfare Plan Assets and Retirement Plan Assets from the FSG MT to these two corporations.

11.    The Acting Secretary brings this action against Defendants FSG, Campbell, McManes, AMRS, GSG, Future Mind Consulting, LLC, and BWell, Inc. to obtain relief under Sections 209 and 502(a)(2) and (5) of ERISA, 29 U.S.C. §§ 1109 and 1132(a)(2) and (5), in the form of equitable remedies that will restore losses to ERISA plans, require the Defendants to

disgorge unlawful profits to the plans, and otherwise redress violations and enforce the provisions of Title I of ERISA.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to ERISA Section 502(e)(1), 29 U.S.C. § 1132(e)(1).

13.    Venue with respect to this action lies in the United States District Court for the District of Maryland, pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), because FSG was, at the time of many of the ERISA violations, headquartered, registered, and operated in this district. AMRS worked closely with FSG. Defendant Campbell resided in this district for much of the relevant period and, at all relevant times, Defendant McManes was an employee of FSG who participated in FSG's ERISA violations as a fiduciary.

## PARTIES

14.    The Acting Secretary, pursuant to Sections 502(a)(2) and (5) of ERISA, 29 U.S.C. §§ 1132(a)(2) and (5), has the authority to enforce the provisions of Title I of ERISA by, among other means, filing and prosecuting claims against fiduciaries and others who committed violations of ERISA.

15.    Defendant Axim Fringe Solutions Group, LLC ("FSG") is an SCA compliance and management firm which, as recently as October 2022, had a principal place of business at 1355 Piccard Drive, Suite 120, in Rockville, Maryland, within the jurisdiction of this Court. FSG is owned at least 98% by Campbell. FSG created and controlled trust accounts to which federal government contractors forwarded contributions made pursuant to the contractors' ERISA-governed health and welfare benefits plans deposited in trust. At all relevant times, FSG exercised discretionary authority and discretionary control over those Health and Welfare Plan Assets, including the payment of health insurance premiums, payment of FSG's fees, and illegal

4

transfers of the Health and Welfare Plan Assets among various trust accounts including the FSG MT and the FSG OA. At all relevant times, therefore, FSG was a fiduciary to the ERISA plans under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). As a fiduciary, an entity providing services to ERISA plans, and an entity owned by fiduciary Campbell, FSG was a party in interest to the plans under ERISA Sections 3(14)(A), (B), and (G), 29 U.S.C. §§ 1002(14)(A), (B), and (G) for the relevant time period.

16.     At all relevant times, Axim Managed Retirement Solutions, LLC ("AMRS") was a retirement benefits management firm with a principal place of business, as recently as October 2022, at 1355 Piccard Drive, Suite 120, in Rockville, Maryland, within the jurisdiction of this Court. During the relevant time period, AMRS, also owned by Campbell, exercised discretionary authority and discretionary control of employer contributions to retirement plans—the Retirement Plan Assets. Because of its discretionary authority and control of the Retirement Plan Assets, AMRS is a fiduciary to the employer-sponsored retirement plans within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A). As a plan fiduciary, a party providing services to ERISA plans, and a party owned by a fiduciary, AMRS was a party in interest under ERISA Sections 3(14)(A), (B) and (G), 29 U.S.C. §§ 1002(14)(A), (B), and (G).

17.     At all relevant times, Axim Global Strategies Group, LLC ("GSG") was an insurance brokerage firm with a principal place of business, as recently as October 2022, in Rockville, Maryland. Campbell is a 97% owner of GSG, which served as an insurance broker to the health and welfare plans. GSG is a party-in-interest to the retirement plans pursuant to ERISA Section 3(14)(B) and (G), 29 U.S.C. §§ 1002(14)(B) and (G).

18.     Melissa McManes is the Director of Compliance Accounting at FSG. She resides in Nevada. She exercised discretionary authority and control over the Health and Welfare Plan

Assets and Retirement Plan Assets. Because of her discretionary authority and control of Health and Welfare Plan Assets and the Retirement Plan Assets, McManes was a fiduciary pursuant to ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). Specifically, McManes exercised authority and control over ERISA plan assets by transferring them among the FSG MT, various Sub-Trust accounts, the AMRS MT, and the FSG OA. McManes used Health and Welfare Plan Assets to pay FSG's fees. As a fiduciary and a provider of services to the various ERISA plans, McManes is a party in interest to the ERISA plans pursuant to ERISA Section 3(14)(A) and (B), 29 U.S.C. § 1002(14)(A) and (B).

19.     Campbell, at all relevant times, was the sole owner of AMRS, Future Mind Consulting, LLC, and BWell, Inc., a 98% owner of FSG, and a 97% owner of GSG. He currently resides in Nevada but formerly resided at some times during the relevant period at 10808 Pathway Lane in Monrovia, Maryland. He was the named trustee to the FSG Sub-Trusts. Campbell exercised discretionary authority and control over the Health and Welfare Plan Assets and the Retirement Plan Assets and was therefore a fiduciary pursuant to ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). Specifically, Campbell exercised authority and control over ERISA plan assets by transferring them among the FSG MT, various Sub-Trust accounts, the AMRS MT, and the FSG OA. Campbell used Health and Welfare Plan Assets to pay FSG's fees. As a fiduciary, a provider of services to ERISA plans, and the owner of FSG and AMRS, Campbell is a party-in-interest pursuant to ERISA §§ 3(14)(A), (B), and (H), 29 U.S.C. §§ 1002(14)(A), (B), and (H).

20.     Future Mind Consulting, LLC ("Future Mind") is a limited liability company wholly owned by Campbell. Its registered address and principal place of business is 16 South

Summit Avenue, Suite 220, in Gaithersburg, Maryland. Its registered address and principal place of business is 16 South Summit Avenue in Gaithersburg, Maryland.

21.     BWell, Inc. is a corporation wholly owned by Campbell. Its registered address and principal place of business is 16 South Summit Avenue, Suite 220, in Gaithersburg, Maryland.

## FACTUAL ALLEGATIONS

### FSG's Impermissible Fees and Misappropriation of Health and Welfare Plan Assets

22.     Axim Fringe Solutions Group, LLC ("FSG") markets itself as a company that will administer health and welfare fringe benefits for companies performing services for the U.S. Government under contracts regulated by the SCA.

23.     The SCA applies to "any contract" that (1) "is made by the Federal Government or the District of Columbia," (2) "involves an amount exceeding $2,500," and (3) "has as its principal purpose the furnishing of services in the United States through the use of service employees." 41 U.S.C. § 6702(a). The SCA thus applies when the government hires contractors ("service contractors") to provide various services, such as cleaning federal buildings, preparing meals, and groundskeeping. *See* 29 § 4.130 (illustrating types of contracts to which SCA applies). The service contractors, in turn, hire service employees to perform the work. Every SCA-covered contract must contain contractual clauses setting forth the contractor's SCA obligations and must attach a wage determination issued by the Acting Secretary of Labor, through the Department of Labor's Wage and Hour Division (WHD). *See* 41 U.S.C. § 6703; 29 C.F.R. § 4.6.

24.     Congress passed the SCA in 1965 to ensure that service employees performing on federal contracts receive at least the prevailing wages and fringe benefits in the areas in which they work. Congress designed the SCA "to provide labor standards for the protection of

employees of contractors and subcontractors furnishing services to or performing maintenance service for Federal agencies." S. Rep. No. 89-798 (1965); the SCA was also intended to prevent the federal government from being "a party to the depressing of labor standards in any area of the Nation." 111 Cong. Rec. 24,387 (1965) (Congressman O'Hara, SCA co-author). Pursuant to the SCA, WHD issues wage determinations for various job categories in different areas of the country. These wage determinations include hourly rates of pay and required fringe benefits, which are generally expressed in an hourly rate.

25.    To meet the fringe benefits requirement, service contractors have the option of providing fringe benefits, which must be furnished pursuant to a bona fide plan, fund, or program, paying the fringe rate to the employees in cash, or providing a combination of fringe benefits and cash payments. Some service contractors satisfy their fringe benefit obligations by paying health and welfare insurance premiums, using any remaining funds to provide some other benefit, such as a retirement plan contribution, or paying the remaining funds to their employees.

26.    FSG performs administrative services for its service contractor clients in connection with its clients' provision of health and welfare benefits to their service employees. In 2021, FSG provided services to at least 54 service contractors located throughout the United States.

27.    FSG markets itself as being able to "help government contractors lower overhead and reduce their compliance burden – all while improving contract profitability" as a "zero-net cost" service provider. Rather than having employers pay the administrative costs associated with providing health and welfare fringe benefits programs to their employees, costs that are normally borne by employers, FSG deducts its fees from the fringe benefits contributions which its service contractor clients are required to make on behalf of their service employees. This

shifts a cost normally borne by the service contractor on to the service employees, reducing the employees' fringe benefits below the amount required by the SCA.

28.     To perform this scheme, FSG and its clients entered Employee Welfare Benefits Plan Trust Agreements ("Trust Agreements"). The Trust Agreements stated that FSG's clients, identified in the Trust Agreements as "plan sponsors," are plan sponsors contracting with FSG to establish a trust for the payment of health and welfare insurance benefits. The Trust Agreements name Campbell as the trustee of the trust. The Trust Agreements state that the clients' contributions will be held in trust by FSG for the exclusive purpose of providing benefits to the ERISA plan participants and their beneficiaries and reasonable administrative expenses.

29.      FSG's Provider Client Agreements specified the services that FSG would provide to its service contractor clients and the fees FSG charged for its services and provided details on the procedures that FSG had agreed to follow when providing its services ("the Provider Client Agreements").

30.     Under these Provider Client Agreements, FSG billed its clients for monthly welfare benefits costs and forwarded those funds to benefits providers such as health insurance companies.  FSG also performed accounting and recordkeeping services; generated SCA compliance reports; maintained an online portal for clients and their employees; and responded to certain employee inquiries. FSG had no role in benefit design, claims processing, enrollment, benefit modification, or termination of participant coverage.

31.     The Provider Client Agreements established a multi-step procedure by which its clients paid for fringe benefits and FSG's fees. First, the service contractor would provide "census data" to FSG showing the number of employees who performed work and the number of hours each employee worked. Next, FSG would use this information to compute the total amount

9

of fringe benefits owed to each employee under the applicable Wage Determination. Then, FSG would send an invoice to the service contractor for the fringe benefits due as well as its per-employee-per-month fee ("PEPM"), which ranged from $10 to $40.

32.     Upon receipt of FSG's invoice, service contractors were to remit the fringe benefit payments and the PEPM fee to the FSG MT account held at Eagle Bank. The FSG MT commingled the contributions from all of FSG's clients. Upon receipt of the funds in that account, FSG agreed to forward those funds to the Sub-Trusts created for each employer.

33.     From the Sub-Trusts, FSG agreed to make three payments: (1) pay premiums to insurance companies; (2) forward the PEPM fee to the FSG Operating Account at Eagle Bank ("FSG OA"); and (3) forward residual amounts to a 401(k) retirement account custodian.

34.     The chart below shows the procedure described in the Agreements:



35.     While FSG's Provider Client Agreements required that employer contributions be forwarded to the employer's Sub-Trusts for the payment of the health and welfare insurance premiums and the PEPM fees, FSG often did not forward the contributions to the Sub-Trusts and failed to keep accurate records of which funds in the AMT belonged to particular clients. Instead,

FSG, as directed by McManes and Campbell, set up a single account in the name of one of its clients, Central Research, Inc. (the "CRI Account"), and often allocated funds from the FSG MT, through employer sub-trusts, to the CRI Account on an *ad hoc* basis when needed to pay insurance premiums for various clients and paid the health and welfare premiums from the CRI Account. CRI was unaware of that its account was being used in this way. By taking these actions, FSG, Campbell, and McManes each exercised discretionary authority and control over the Health and Welfare Plan Assets.

36.     In addition, FSG, as directed by McManes and Campbell, routinely took large withdrawals from the FSG MT, transferring those funds to the FSG OA. FSG, Campbell, and McManes each exercised discretionary authority and control over the Health and Welfare Plan Assets when they made these transfers. Between December 2015 and June 30, 2022, FSG took 139 withdrawals totaling $5,978,608.03 directly from the FSG MT. They have failed to provide any invoices correlating these withdrawals with the fees FSG's clients had agreed to pay. By August 2022, FSG had transferred only $629,988.71 from the FSG OA back to the Master Trust. FSG claims to have transferred an additional $903,630.00 back to the Master Trust since that date, but the Acting Secretary has not yet confirmed that the payments came from sources other than ERISA plan assets. Even giving credit for both transfers, withdrawals of $4,444,989.32 would remain unaccounted for.

37.     Because of these large and impermissible withdrawals from the FSG MT, the FSG OA frequently ran short on funds that it needed to meet payroll and other business expenses. FSG, Campbell, and McManes, exercising discretionary authority and control over the Health and Welfare Plan Assets, frequently moved those assets between the FSG MT and the FSG OA as needed to meet FSG's own expenses and to pay the health and welfare premiums,

which were often overdue. Because of cash flow problems, FSG, Campbell, and McManes also exercised discretionary authority and control over the Health and Welfare Plan Assets by paying health insurance premiums up to 60 days late, resulting in some insurance carriers sending notices of late payments to some FSG clients.

38.     Since January 2016, the FSG OA transferred $909,125.00 to a company owned by Campbell – Future Mind Consulting, LLC ("Future Mind") – and transferred $142,574.00 to another company owned by Campbell – BWell, Inc. Both companies occasionally transferred funds back to the FSG OA. Future Mind paid Campbell's salary.

<u>AMRS's Mismanagement of Retirement Plan Assets</u>

39.     At all relevant times, AMRS provided third-party administration services for defined contribution retirement benefits plans sponsored by federal service contractor employers.

40.     Many of these employers were clients of both FSG and AMRS. In such cases, FSG computed the amount of fringe benefits remaining after payment of health and welfare insurance premiums and PEPM fees and provided that information to the service contractors. The service contractors were then to remit the health and welfare payments, plus the PEPM fee, to the FSG MT and pay any residual amount to the AMRS Master Trust ("AMRS MT"), which was to allocate these funds to 401(k) benefits custodians. The amounts remitted to the AMRS Master Trust are Retirement Plan Assets. FSG, Campbell, and McManes, exercising fiduciary authority and fiduciary control of the Retirement Plan Assets, often deviated from that procedure by routing the 401(k) contributions through the FSG MT, as follows: Client 401(k) payment to AMRS Master Trust → Client sub-trust → FSG MT → FSG Sub-Trust → AMRS MT → 401(k) benefits custodian.

41.     Several other employers, who were not service contractors, were clients of AMRS but not FSG. Those employers contributed 401(k) withholdings directly to the AMRS MT. From January 1, 2018, to August 12, 2021, AMRS provided services to 21 employers who were clients of both FSG and AMRS, and an additional 28 who were solely AMRS clients. The retirement contributions paid by these clients to AMRS were also Retirement Plan Assets.

42.     In multiple transactions between November 2020 to August 2022, FSG, AMRS, Campbell, and McManes, exercising fiduciary authority and control over Health and Welfare Plan Assets as well as Retirement Plan Assets, transferred $1,236,200.00 from the AMRS MT to the FSG MT, booking these transfers as "Loan[s] Per JVC [James V. Campbell]." During the same period, exercising fiduciary authority and control over Health and Welfare Plan Assets as well as Retirement Plan Assets, FSG, AMRS, McManes and Campbell transferred $1,288,000.00 from the FSG Master Trust back to the AMRS Master Trust. Most of these transactions were labeled as "reimbursements." Neither trust paid interest on the transferred funds.

<u>Campbell's Use of GSG to Receive Health and Welfare Plan Assets as Commissions</u>

43.     Axim Global Strategies Group, LLC ("GSG") served as an insurance broker to the health and welfare plans sponsored by clients of FSG. Campbell owns 97% of GSG and controls the company. From January 1, 2018, to August 12, 2021, Campbell, as trustee of the FSG trusts, used Health Plan Assets to pay insurance brokerage fees to GSG. GSG took commissions and received fees for its services from those Health Plan Assets but often did not disclose these fees to the plans or FSG's clients.

<u>**COUNT I**</u>

**Impermissible Use of Health and Welfare Plan Assets to Pay Employer's Expenses**

44.    Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Acting Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 42, inclusive.

45.    When an employer deposits funds in a trust created for the purpose of providing employee health and welfare benefits, the funds become plan assets.

46.    The Trust Agreements between FSG and its clients explicitly created trusts for the purpose of providing health and welfare benefits to the clients' employees. Thus, these contributions are ERISA plan assets, referred to herein as "Health and Welfare Plan Assets."

47.    Plan assets may only be used for the exclusive benefit of plan participants and their beneficiaries. Therefore, plan assets may not be used to pay expenses incurred primarily for the benefit of an employer or plan sponsor.

48.    The SCA requires that federal service contractors pay prevailing wages and fringe benefits to service employees working on federal service projects. 41 U.S.C. § 351, *et seq*. With exceptions not applicable here, the SCA's fringe benefit requirements are computed at an hourly rate set by WHD and are set forth in the wage determination included in the contract. 29 C.F.R. §§ 4.6(b), 4.172. During the period at issue, service contractors were required to provide fringe benefits ranging in value from $4.27 per hour to $4.80 per hour. *See* WHD All Agency Memorandum 217 (June 30, 2015); WHD All Agency Memorandum 239 (June 23, 2022). Service contractors may satisfy their SCA fringe benefit obligations by furnishing fringe benefits such as health insurance and retirement plans pursuant to a bona fide plan, fund, or program, by

making payments in cash, or through some combination thereof. 41 U.S.C. § 6703(2); 29 C.F.R.
§ 4.170(b).

49.     The SCA regulations prohibit service contractors from taking credit towards their
fringe benefit obligations for any cost that is "properly a business expense of the contractor" or
"primarily for the benefit or convenience of the contractor." 29 C.F.R.§ 4.171(e).   Although the
costs incurred by a service contractor's insurance carrier, third-party trust fund, or other third-
party administrator that are directly related to the actual administration and delivery of benefits
can be credited towards the contractor's fringe benefit obligations, administrative costs  incurred
by a service contractor in connection with merely providing fringe benefits to its service
employees "are properly a business expense of the employer" that may not be deducted from the
required fringe benefit rate: "No deduction from the specified amount may be made to cover any
administrative costs which may be incurred by the contractor in providing the benefits, as such
costs are properly a business expense of the employer. 29 C.F.R. § 4.172[.]").

50.     The SCA regulations also specifically require service contractors to keep records
of, among other items, the "rate or rates of monetary wages paid and fringe benefits provided,"
and "total daily and weekly compensation of each employee." 29 C.F.R. § 4.6(g)(1).

51.     FSG, McManes, and Campbell charged PEPM fees to the FSG MT and the Sub-
Trusts to perform administrative tasks that were principally for the benefit or the convenience of
its service contractor clients, including recordkeeping obligations specifically imposed on their
service contractor clients by the SCA. FSG, McManes, and Campbell thus used the Health and
Welfare Plan Assets to pay their clients' business expenses, thereby using ERISA plan assets for
the benefit of those employers rather than the plans' participants and beneficiaries.

52.     In doing so, these Defendants FSG, Campbell, and McManes allowed plan assets to inure to the benefit of their employer clients, which violated ERISA Section 403(c)(1), 29 U.S.C. § 1103(c)(1).

53.     Defendants FSG, Campbell, and McManes used plan assets to pay fees that were not reasonable expenses of administering the trusts, in violation of ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and failed to loyally discharge their fiduciary duties, in violation of ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

54.     As plan sponsors, FSG's clients are fiduciaries to the plans under ERISA Section 2(21)(A), 29 U.S.C. § 1002(a). FSG, Campbell, McManes, and FSG's plan sponsor clients are liable as co-fiduciaries under ERISA Section 405(a), 29 U.S.C. § 1105(a), because they knowingly participated in the use of plan assets to pay employers' expenses, enabled each other to commit these breaches, and knew of the breaches but failed to make reasonable efforts under the circumstances to remedy them.

55.     By charging PEPM fees to the trusts, Defendants FSG, Campbell, and McManes and Plan sponsors engaged in a "direct … furnishing of goods, services, or facilities between the plan and a party in interest," in violation ERISA Section 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C).

56.     FSG and Campbell are liable under ERISA Section 406(a)(1)(C), 29 U.S.C. § 1106(a) as knowing participants in these prohibited transactions.

57.     By charging PEPM fees to the trusts, FSG and Campbell dealt with the plan assets in their own interest or for their own account, in violation of ERISA Section 406(b)(1) and (2), 29 U.S.C. § 1106(b)(1) and (2).

58.     As the result of their conduct described above, FSG, Campbell, and McManes required the plans to suffer losses for which they are liable and received unjust profits which they must disgorge to the plans, pursuant to ERISA Section 409(a), 29 U.S.C. § 1109(a).

## COUNT II

### Misappropriation of Plan Assets

59.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Acting Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 55, inclusive.

60.     From December 2015 to June 30, 2022, Defendants FSG, Campbell, and McManes took $5,978,608.03 in withdrawals from the FSG MT, which held exclusively Health and Welfare Plan Assets. By August 2022, FSG had transferred $629,988.71 from the FSG OA back to the FSG MT, and transferred another $903,630.00 since that date, but this still leaves withdrawals of $4,444,989.32 unaccounted for.

61.     In doing so, Defendants FSG, Campbell, and McManes failed to hold the plan assets in trust, which violated ERISA Section 403(a), 29 U.S.C. § 1103(a).

62.     Defendants FSG, Campbell, and McManes also failed to prudently discharge their fiduciary duties, in violation of ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and failed to loyally discharge their fiduciary duties, in violation of ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

63.     Defendants FSG, Campbell, and McManes caused the ERISA plans to engage in transactions that these Defendants knew or should have known constituted direct or indirect transfers of plan assets to, or use by, or for the benefit of a party in interest, in violation of ERISA Section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D). FSG and Campbell also dealt with the

plan assets in their own interest or for their own account, in violation of ERISA Section 406(b)(1), 29 U.S.C. § 1106(b)(1), and received compensation for their own personal accounts, in violation of ERISA Section 406(b)(2), 29 U.S.C. § 1106(b)(2).

64.    As the result of their conduct described above, FSG, Campbell, and McManes caused the plans to suffer losses for which they are liable for equitable relief pursuant to ERISA Section 409(a), 29 U.S.C. § 1109(a).

65.    FSG, Campbell, and McManes are jointly and severally liable for the breaches of their co-fiduciaries alleged herein pursuant to ERISA Section 405(a), 29 U.S.C. § 1105(a), because (a) they knowingly participated in their co-fiduciaries' misconduct; (b) their failure to comply with their own fiduciary duties enabled their co-fiduciaries to commit the breaches alleged herein; and (c) they had knowledge of the breaches of their co-fiduciaries alleged herein and failed to make reasonable efforts under the circumstances to remedy the breaches.

66.    Campbell and FSG transferred $909,125.00 to a company owned by Campbell – Future Mind Consulting, LLC ("Future Mind") and transferred $142,574.00 to another company owned by Campbell – BWell, Inc. Each corporation participated in this fiduciary breach and had actual or constructive knowledge of the circumstances that rendered the transfers unlawful. Each, therefore, may be enjoined from any act or practice which violates Title I of ERISA and may be made subject to such other appropriate equitable relief to redress the violations in which they knowingly participated, including injunctive relief pursuant to ERISA Section 502(a)(5), 29 U.S.C. § 1132(a)(5). By engaging in these transactions, FSG, Campbell, and McManes engaged in a transaction that they knew or should have known constituted a direct or indirect transfer of plan assets to, or use by, or for the benefit of Campbell, a party in interest, violating ERISA Section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D). Campbell, McManes, and FSG acted as a

party, or represented a party, with interests adverse to the plans, in violation of ERISA Section 406(b)(2), 29 U.S.C. § 1106(b)(2).  In addition, Campbell dealt with plan assets in his own interest or for his own account, in violation of ERISA Section 406(b)(1), 29 U.S.C. § 1106(b)(1).

## COUNT III

### Unlawful Use of Third-Party Trust Accounts

67.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Acting Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 63, inclusive.

68.     FSG, Campbell, and McManes transferred plan assets from the FSG MT to the Sub-Trust of one of their clients, Capital Resources, Incorporated, paying their clients' health insurance premiums through the CRI Account rather than each client's Sub-trust.

69.     AMRS, Campbell, and McManes transferred plan assets from the AMRS MT to a CRI Sub-Trust, forwarding plan assets to employers' 401(k) accounts through that CRI Sub-Trust rather than each client's Sub-Trust.

70.     In doing so, AMRS, FSG, Campbell, and McManes failed to hold the plan assets in trust for the exclusive benefit of the participants and beneficiaries of the plans, which violated ERISA Section 403(a) and (c), 29 U.S.C. §§ 1103(a) and (c). These Defendants also failed to prudently discharge their fiduciary duties, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and failed to loyally discharge their fiduciary duties, in violation of ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

71.     As the result of their conduct described above, AMRS, FSG, Campbell, and McManes caused the plans to suffer losses for which they are liable for equitable relief pursuant to ERISA Section 409(a), 29 U.S.C. § 1109(a).

72.     AMRS, FSG, Campbell, and McManes are jointly and severally liable for the breaches of their co-fiduciaries alleged herein pursuant to ERISA Section 405(a), 29 U.S.C. § 1105(a), because (a) they knowingly participated in their co-fiduciaries' misconduct; (b) their failure to comply with their own fiduciary duties enabled their co-fiduciaries to commit the breaches alleged herein; and (c) they had knowledge of the breaches of their co-fiduciaries alleged herein and failed to make reasonable efforts under the circumstances to remedy the breaches.

## COUNT IV

### Unlawful Transfers Between the AMRS Master Trust and the FSG Master Trust

73.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Acting Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 69, inclusive.

74.     The FSG MT contained Health and Welfare Plan Assets, and the AMRS MT held Retirement Plan Assets. Contributions to retirement plans are ERISA plan assets that must be used for the exclusive purpose of providing retirement benefits to plan participants and their beneficiaries and defraying reasonable expenses of administering the plans pursuant to Section 403(c)(1) of ERISA, 29 U.S.C. § 1103(c)(1).

75.     From November 2020 to August 2022, AMRS, FSG, Campbell and McManes transferred $1,288,000.00 from the FSG MT to the AMRS MT. During the same period, they transferred $1,236,200.00 from the AMRS MT back to the FSG Master Trust.

76.     In doing so, Defendants AMRS, FSG, Campbell, and McManes failed to hold the plan assets in trust for the exclusive benefit of plan participants and beneficiaries, which violated ERISA Sections 403(a) and (c), 29 U.S.C. §§ 1103(a) and (c).

77.     Defendants AMRS, FSG, Campbell, and McManes failed to prudently discharge their fiduciary duties, in violation of ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), failed to loyally discharge their fiduciary duties, in violation of ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and violated the terms of the plans' trust agreements with FSG, in violation of ERISA Section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

78.     As the result of their conduct described above, AMRS, FSG, Campbell, and McManes caused the plans to suffer losses for which they are liable for equitable relief, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a).

79.     AMRS, FSG, Campbell, and McManes are jointly and severally liable for the breaches of their co-fiduciaries alleged herein pursuant to ERISA Section 405(a), 29 U.S.C. § 1105(a), because (a) they knowingly participated in their co-fiduciaries' misconduct; (b) they failed to comply with their own fiduciary duties enabled their co-fiduciaries to commit the breaches alleged herein; and (c) they had knowledge of the breaches of their co-fiduciaries alleged herein and failed to make reasonable efforts under the circumstances to remedy the breaches.

## **COUNT V**

### **Undisclosed fees charged by GSG**

80.     Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Acting Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 76, inclusive.

81.     While acting as fiduciaries, FSG and Campbell used Health Plan Assets to pay commissions to GSG, a company that Campbell owned.

82.     In doing so, FSG and Campbell failed to prudently discharge their fiduciary duties, in violation of ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and failed to loyally discharge their fiduciary duties, in violation of ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

83.     Campbell engaged in prohibited transactions when he used Health Plan Assets to pay commissions to GSG. Campbell dealt with the Health Plan Assets in his own interest or for his own account, in violation of ERISA Section 406(b)(1), 29 U.S.C. § 1106(b)(1); used plan assets for his own personal accounts, in violation of ERISA Section 406(b)(2), 29 U.S.C. § 1106(b)(2); and received consideration for his own personal account from a party dealing with the plans in connection with a transaction involving the assets of the plan, in violation of ERISA Section 406(b)(3), 29 U.S.C. § 1106(b)(3). GSG was a knowing participant in these breaches because it knew, or had reason to know, that FSG's payment of its commissions was illegal.

84.     As the result of his conduct described above, Campbell and GSG caused the plans to suffer losses for which they are liable and received unjust profits which they must disgorge to the plans, pursuant to ERISA Section 409(a), 29 U.S.C. § 1109(a).

## PRAYER FOR RELIEF

WHEREFORE, the Acting Secretary of Labor prays that this Court enter an Order:

1.     Permanently removing Defendants Campbell, McManes, FSG, and AMRS, as fiduciaries, service providers, trustees, and administrators of the FSG MT, the AMRS MT, and/or the Sub-Trusts, and permanently enjoining anyone acting on their behalf, including their officers, agents, employees, assigns, subsidiaries, affiliates, service providers, accountants,

attorneys, and any other party acting in concert with them or at their direction, as fiduciaries of the FSG MT, the AMRS MT, and/or the Sub-Trusts;

2.      Permanently enjoining Defendants Campbell, McManes, FSG, and AMRS from acting as a fiduciary, service provider, trustee, or administrator to the FSG MT, the AMRS MT, or the Sub-Trusts and preliminarily and permanently enjoining anyone acting on their behalf, including their officers, agents, employees, assigns, subsidiaries, affiliates, service providers, accountants, attorneys, and any other party acting in concert with them or at their direction from acting as a fiduciary to the FSG MT, the AMRS MT, or the Sub-Trusts;

3.      Appointing an independent fiduciary proposed by the Acting Secretary as the independent fiduciary to the FSG MT, the AMRS MT, and the Sub-Trusts, with full and exclusive fiduciary authority over their administration and management, and full and exclusive control over the ERISA plan assets of FSG, the FSG MT, AMRS, the AMRS MT, and Sub-Trusts' assets, including, but not limited to:

      a. Authority to exercise all fiduciary responsibilities relating to the FSG, AMRS, the FSG MT, the AMRS MT, and the Sub-Trusts;

      b. Authority to take exclusive control of all plan assets in the FSG MT, the AMRS MT, and the Sub-Trusts;

      c. Authority given to trustees under the terms of the Trust Agreements;

      d. Authority to amend the Trust Agreements and Provider Client Agreements;

      e. Exclusive authority to appoint, replace and remove such administrators, trustees, attorneys, employees, assigns, agents, and service providers as the Independent Fiduciary shall, in the Independent Fiduciary's sole discretion,

determine as necessary to aid the Independent Fiduciary in the exercise of the Independent Fiduciary's powers, duties, and responsibilities to the trusts and participating ERISA plans;

f. Authority to conduct an accounting of all medical claims and negotiate all medical claims;

g. Authority to terminate FSG, the FSG MT, AMRS, the AMRS MT, and the Sub-Trusts if in the best interest of the participating plans and participants and, in that event, to establish a claims submission deadline, and to adjudicate all claims filed by such deadline, and to deny claims not filed by the claims submission deadline;

h. Authority to adjudicate and pay or deny any and all claims submitted;

i. Authority to pursue recovery of monies owed and due to the FSG MT, the AMRS MT, or the Sub-Trusts from any person obligated to make such payments pursuant to the Participation Agreements or Trust Agreements;

j. Authority to identify and pursue recovery of the FSG MT, AMRS MT, or Sub-Trusts' assets as well as any monies to which the FST MT, the AMRS MT, or the Sub-Trusts have a right of recovery;

k. Authority to identify and pursue claims on behalf of the FSG MT, the AMRS MT, or the Sub-Trusts;

l. Except as provided herein, the authority to delegate to such administrators, trustees, attorneys, employees, assigns, agents, and service providers such fiduciary responsibilities as the Independent Fiduciary shall

determine appropriate. The Independent Fiduciary may not, however, delegate the authority to appoint, replace, and remove such administrators, trustees, attorneys, employees, assigns, agents, and service providers, or the responsibility to monitor the activities of the FSG, AMRS, or their service providers;

m. Authority to pay itself reasonable and necessary fees from FSG, AMRS, the FSG MT, the AMRS MT, and Sub-Trusts' assets and pay the reasonable and necessary fees of service providers.

4.     Requiring Defendants FSG, AMRS, Campbell, McManes, Future Mind, BWell, and GSG to provide to the Independent Fiduciary all documents, records, accounts, or other information required to administer and manage the FSG MT and Sub-Trusts;

5.     Requiring Defendants to jointly and severally restore all losses, including interest, they caused to the FSG MT or Sub-Trusts;

6.     Defendants to jointly and severally make equitable restitution to the FSG MT and Sub-Trusts of all losses resulting from their fiduciary breaches, including interest;

7.     Requiring Defendants to jointly and severally reimburse the fees and expenses of the Independent Fiduciary;

8.     Requiring Defendants to disgorge to the FSG MT or the Sub-Trusts all profits and fees and other monies earned in connection with their violations;

9.     Pursuant to the All-Writs Act staying, enjoining and/or prohibiting any person or entity from claiming as against the assets of the FSG MT or Sub-Trusts outside of the procedures and processes to be set forth by the Independent Fiduciary and for such protections to be maintained until closure and until further order by this Court;

10.     Permanently enjoining Defendants FSG, AMRS, Campbell, and McManes, or anyone acting on their behalf, including their principals, officers, directors, owners, agents, assigns, or subsidiaries, from ever acting as a fiduciary or service provider to any plan covered by Title I of ERISA; from marketing or enrolling any employers, professional employer organizations, or participants in any ERISA or non-ERISA covered health plan or any plan purporting to provide any type of medical benefits;

11. Awarding the Acting Secretary her costs incurred in this civil action; and

12. Granting such other relief as may be equitable, just, and proper.

Respectfully submitted,

|  | **UNITED STATES DEPARTMENT OF LABOR** |
|---|---|
| Mailing Address: |  |
|  | Seema Nanda |
| U.S. Department of Labor | Solicitor of Labor |
| Office of the Regional Solicitor |  |
| 1835 Market Street | Samantha Thomas |
| Mailstop SOL/22 | Acting Regional Solicitor |
| Philadelphia, PA 19103-2968 |  |
| O:  215-861-5128 | Andrea Luby |
| luby.andrea@dol.gov | Senior Trial Attorney |
|  |  |
|  | */s/ Andrea Luby* |
|  | Senior Trial Attorney |